## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| MICHAEL DEHORITY and RICHARD DEHORITY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 2:25-cv-02383-TLP-tmp |
| v. | ) | |
| | ) | |
| WOODROW CHAMBERLAIN and T. PHILLIP DEAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTIONS FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY

On April 3, 2025, Michael DeHority ("M. DeHority") and Richard DeHority ("R. DeHority") (collectively, "Plaintiffs" or the "DeHoritys") sued Woodrow Chamberlain ("Chamberlain") and T. Phillip Dean ("Dean") (collectively, "Defendants"). (ECF No. 1.) Plaintiffs filed a verified Complaint and brought claims for (1) breach of contract, (2) breach of fiduciary duty, (3) conversion, (4) unjust enrichment, (5) civil conspiracy, (6) fraud, and (7) violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). (*Id.*) With the Complaint, Plaintiffs included four exhibits. (ECF Nos. 10-1–10-4.)

At the same time Plaintiffs sued here, they moved for a temporary restraining order and preliminary injunction ("Preliminary Injunction Motion" or "Motion"). (ECF No. 1-4.) Plaintiffs later submitted the Declaration of Michael DeHority ("M. DeHority's Declaration") to support this Motion. (ECF No. 22.) Defendants opposed the Preliminary Injunction Motion and have asserted several affirmative defenses. (ECF No. 18.) Along with their response,

1

Defendants included the Declaration of Woodrow Chamberlain ("Chamberlain's Declaration") and five exhibits.  (ECF Nos. 18-1–18-6.)

On April 23, 2025, the Court held a hearing on Plaintiffs' Preliminary Injunction Motion. At the hearing, Plaintiffs introduced many of its documents into evidence as collective Exhibit 1, and the Court heard arguments from counsel.  Also at the hearing, Plaintiffs made their requests clear.  Plaintiffs would like this Court to enter an order covering five items: that (1) Defendants comply with the Stockholders' Agreement, Payment Agreement, and Bylaws; (2) Defendants give Plaintiffs monthly financial statements about eMars, Inc.; (3) Defendants may not act unilaterally to make decisions outside the ordinary course of business; (4) either Defendants stop receiving owner compensation or that they start paying Plaintiffs owner compensation; and (5) Plaintiffs receive access to the business records of eMars, Inc., including emails and databases stored on the cloud.

 For the reasons below, the Court **DENIES** Plaintiffs' Preliminary Injunction Motion (ECF No. 1-4) **WITHOUT PREJUDICE**.

## BACKGROUND

### I.    eMars, Inc.

This case is about a long-running business dispute between the four owners of eMars, Inc. ("eMars")—Plaintiffs, M. DeHority and R. DeHority, and Defendants, Chamberlain and Dean.  In 1999, brothers M. DeHority and R. DeHority founded eMars, a company that provides a certified payroll processing system to government contractors.  (ECF No. 1 at PageID 4.)  Dean joined eMars in either 2001 or 2002 to help with programming and developing eMars's payroll compliance software.  (ECF No. 22-1 at PageID 203; ECF No. 18-1 at PageID 146.)

Chamberlain then joined in eMars in 2003 as a consultant.[1]  (ECF No. 18-1 at PageID 145–46;

ECF No. 22-1 at PageID 203.)  And in June 2006, M. DeHority, R. DeHority, Chamberlain, and

Dean signed a Stockholders' Agreement that gave each of them a 25% ownership interest in

eMars.  (ECF No. 22-1 at PageID 204.)  This means Plaintiffs own 50% of eMars's stock and

Defendants own 50% of eMars's stock.

M. DeHority, R. DeHority, Chamberlain, and Dean also serve as eMars's four directors.

(*Id.* at PageID 205.)  As for their other roles, M. DeHority serves as eMars's Chairman,

Secretary/Treasurer, and CFO; Chamberlain serves as eMars's President and CEO; Dean serves

as eMars's CIO; and R. DeHority serves as eMars's Vice President.  (ECF No. 18-1 at PageID

147.)  In January 2010, the four shareholders approved corporate bylaws ("Bylaws") for eMars.

(ECF No. 18-1 at PageID 147.)  And in August 2010, the shareholders entered into a Payment

Agreement.[2]  (ECF No. 22-1 at PageID 205.)

## II.    The Dispute

### A.    Plaintiffs' Version

It did not take long for disputes between eMars's four equal owners to arise.  Plaintiffs

assert that "over time, Defendants began to take over eMars and to shut the DeHoritys out of the

DeHoritys' own company."  (ECF No. 1 at PageID 5.)  And Plaintiffs give some examples to

support their position.  Plaintiffs state that Defendants (1) "have taken over the compensation

decisions of eMars" and have "stopped paying the DeHoritys distributions and salaries

altogether"; (2) "have continuously excluded the DeHoritys from the management decisions of

---

[1] M. DeHority states that Chamberlain joined eMars as the Senior Vice President of Marketing
for eMars.  (ECF No. 22-1 at PageID 203.)
[2] The parties dispute whether the Payment Agreement is an enforceable contract, but the Court
need not resolve this dispute to address the Preliminary Injunction Motion.

eMars"; (3) have "denied the DeHoritys access to crucial eMars information"; (4) have

concealed and moved the location of eMars's computer servers; and (5) have "gone so far as to

bring in another individual to buy each of the DeHoritys' stock." (*Id.* at PageID 7–9.) Plaintiffs

add that Chamberlain has "disregarded the DeHoritys' rights to approve and sign contracts on

behalf of eMars" and that Dean has blocked the DeHoritys' access to the payroll and email

systems of eMars. (*Id.* at PageID 8.)

As an example of a contract Chamberlain tried to enter into without Plaintiffs' consent,

Plaintiff M. DeHority explains that in 2011, Chamberlain "attempted to sign a major contract

with Southern Company on eMars's behalf without having Richard, Phil or me read the entirety

of the contract and approve it." (ECF No. 22-1 at PageID 206.) M. DeHority adds that "Phil

expressed concern that if Woody signed the contract, eMars may not be able to perform the

contractual obligations." (*Id.*)

Besides the above actions, Plaintiffs accuse Defendants of applying for Paycheck

Protection Program ("PPP") loans and setting up an alleged takeover enterprise in Washington.

(ECF No. 1 at PageID 5–7.) Plaintiffs explain that in April 2020 Defendants, without Plaintiffs'

consent, applied for two PPP loans using Plaintiffs' identities. (*Id.* at PageID 5–6.) And

Plaintiffs add that "Chamberlain also applied for a COVID-19 Economic Injury Disaster Loan on

eMars's behalf—again, without the DeHoritys' knowledge or consent." (*Id.* at PageID 6.)

Plaintiffs do not provide any information on when Chamberlain applied for this third loan. (*Id.*)

What is more, Plaintiffs assert that Defendants, in July 2021, formed a new corporation

in Washington state under the name "eMars, Inc." ("eMars Washington") without Plaintiffs'

knowledge or consent. (*Id.* at PageID 6.) Plaintiffs included with their Complaint eMars

Washington's Articles of Incorporation, which list Chamberlain as eMars' sole governor. (ECF

No. 10-4.)  According to Plaintiffs, "Defendants apparently set up eMars Washington in an attempt to further squeeze the DeHoritys out of eMars and to misappropriate funds and resources rightfully belonging to eMars and to the DeHoritys as eMars's shareholders, officers, and directors."  (ECF No. 1 at PageID 7.)

The Court will now set out Defendants' version of these events.

### B.    Defendants' Version

Defendants explain these events somewhat differently.  From Chamberlain's point of view, Plaintiffs have not been active participants in the running of eMars for about 20 years. (ECF No. 18-1 at PageID 148.)  He states that that the shareholders "have operated in the same manner for nearly 20 years, with me running the business and always being in charge of signing contracts and handling customer relationships."  (*Id.*)  He also states, "[a]lthough I anticipated, upon joining eMars, that the DeHoritys would serve as equal business partners, I am not aware of the DeHoritys generating any business or performing any services for eMars."  (*Id.*)

And Chamberlain explains the actions that Plaintiffs assert he and Dean took to shut Plaintiffs out of eMars.  Concerning Plaintiffs' salaries, Chamberlain explains that Plaintiffs have never received a salary.  (*Id.* at PageID 147.)  He states that although "the Bylaws provided for equal compensation among the executive officers," the stockholders agreed at the time that "only officers who worked for and provided services to [eMars] would receive compensation for their efforts."  (*Id.*)  He states that "years later" Plaintiffs started to complain about their lack of salary, and so, in 2020, Chamberlain discussed with Plaintiffs positions they could fill.  (*Id.* at PageID 148.)  But, according to Chamberlain, Plaintiffs "rebuffed" his efforts and "refused to accept any substantive role with [eMars] and did not provide any services."  (*Id.*)

And Chamberlain spells out why, from his view, Plaintiffs do not have email accounts or access to the payroll system. As for the emails, Chamberlain acknowledges that he cut off Plaintiffs' email accounts in 2021. (*Id.* at PageID 149.) As for his explanation, Chamberlain states that, with time, it became evident that M. DeHority "planned to use his eMars email account to solicit direct payments from customers." (*Id.*) And Chamberlain gave an example of this from November 2020, when a "representative from one of our customers, Sundt, called me to ask why Michael sent him an email directing him to make their annual payment directly to him." (*Id.*) Chamberlain also adds that because Plaintiffs do not do work for the company, there is no reason for Plaintiffs to have email accounts. (*Id.* at PageID 149–50.) As for the payroll system, Chamberlain explains that eMars got this system in 2023. (*Id.* at PageID 151.) He states that Plaintiffs have never had access to the system and that he is unaware of any legitimate business purpose for why Plaintiffs would have access to that system. (*Id.*)

And Chamberlain also responds to Plaintiffs' allegations about Defendants concealing the location of eMars's computer servers. (*Id.*) Chamberlain explains that he nor Dean physically relocated eMars' server. (*Id.*) Instead, as he explains it, as eMars's capabilities and services expanded, "the server lacked adequate security and bandwidth, so we relocated the data to the cloud in or around February 2021." (*Id.*) And Chamberlain denies that he and Dean brought in an individual to buy Plaintiffs' stock and exclude them from ownership. (*Id.* at PageID 151.) Instead, he explains that, back in 2023, an individual considered buying out Plaintiffs' interest in eMars as part of a potential settlement of the current dispute. (*Id.* at 151–52.) He adds that Plaintiffs were also interested in selling their stake, but that the buyer backed out after meeting with Plaintiffs. (*Id.*)

Next, Chamberlain admits that he withheld business records from Plaintiffs. (*Id.*) He explains that he did not provide the records because he was concerned that M. DeHority would misuse the information. (*Id.*) Chamberlain states that now, given that the Court has entered a protective order here, he provided his attorneys "bank statements, 1099s and W-2s, financial statements from QuickBooks and customer identities and contracts" and that Plaintiffs are "now fully informed with the current status of [eMars]." (*Id.*)

To explain why he did not provide Plaintiffs documents about eMars earlier, Chamberlain describes a time when M. DeHority impermissibly moved money from eMars's corporate account at First Tennessee. (*Id.*) He explains that M. DeHority withdrew $99,000 and deposited it into an account with an undisclosed bank. (*Id.* at PageID 150.) But M. DeHority describes this incident differently. (ECF No. 22-1 at PageID 207.) He states that the funds were transferred to the Bank of Bartlett because First Tennessee Bank requested that the funds be transferred to a federally insured bank. (*Id.*) M. DeHority adds that any use of these funds has followed eMars's agreements. (*Id.*)

Defendants also counter Plaintiffs' assertions that Defendants improperly applied for PPP loans and set up a new corporation in Washington as a takeover enterprise. Chamberlain asserts that all PPP loan applications were canceled and that eMars never received any PPP loans. (ECF No. 18-1 at PageID 152.) And about eMars Washington, Chamberlain maintains that because eMars serves customers and pays taxes in Washington, he was trying to register eMars as active in the state in 2021. (*Id.* at PageID 150.) But he was never trying to form a new company to siphon off the work and assets of eMars. Rather he claims he mistakenly selected eMars's domicile as "domestic" instead of "foreign" on the forms. (*Id.*) Chamberlain states that he has begun to correct this error, and he has provided documentation of the correction. (*Id.* at PageID

7

150–51; ECF No. 18-4.)  Chamberlain adds that the "registration in Washington was not the

creation of a separate corporation or 'takeover' entity, and it has never been used to conduct

business."  (ECF No. 18-1 at PageID 151.)

Now that the Court has provided background information and summarized the dispute,

the Court will next describe the relevant legal standard and then assess Plaintiffs' Preliminary

Injunction Motion.

## **LEGAL STANDARD**

The movant bears the burden of showing that they are entitled to a preliminary

injunction.  *See Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).  Courts consider TRO

motions and preliminary injunction motions using the same four factors: (1) whether the movant

has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable

harm absent an injunction, (3) whether granting an injunction would cause "substantial harm" to

others, and (4) whether the public interest would be served by the issuance of an injunction.  *See*

*Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008).  As for the irreparable

harm factor, it is "indispensable: If the plaintiff isn't facing imminent and irreparable injury,

there's no need to grant relief now as opposed to at the end of the lawsuit."  *D.T. v. Sumner Cnty.*

*Sch.*, 942 F.3d 324, 327 (6th Cir. 2019).  This means that "a district court is 'well within its

province' when it denies a preliminary injunction based solely on the lack of an irreparable

injury."  *Id.*  (citing *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991)).

## **ANALYSIS**

### I.   **Irreparable Harm**

Harm is irreparable "if it is not fully compensable by monetary damages."  *Overstreet v.*

*Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  To show irreparable

harm, the movant must allege harm that is "both certain and immediate, rather than speculative or theoretical." *Brown v. Greene Cnty. Vocational Sch. Dist. Bd. of Educ.*, No. 3:24-CV-14, 2024 WL 620937, at *4 (S.D. Ohio Feb. 14, 2024) (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).  What is more, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).  Indeed, "[a]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, Inc., 511 F. App'x 398, 405 (6th Cir. 2013).

Plaintiffs fail to show irreparable harm here.  And without irreparable harm, the Court finds that Plaintiffs' Preliminary Injunction Motion should be denied.  *See D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019); *Oviedo-Granados v. Spangler*, No. 3:21-CV-412-TAV-JEM, 2023 WL 2561780, at *3 (E.D. Tenn. Mar. 17, 2023) ("Having found that plaintiff has not demonstrated the dispositive factor of irreparable harm, the Court is relieved of its duty to consider and weigh the other injunction factors.").  As explained below, Plaintiffs have not asserted their alleged rights with reasonable diligence and the harm they identified is either speculative or compensable with monetary damages.

### A.    Delay

For starters, Plaintiffs' delay in asserting their rights, seeking injunctive relief, or suing weighs heavily against their claim of irreparable harm here.  The delays in this case are significant.  Many of the specific actions that Plaintiffs focus on occurred three to five years ago. Indeed, Plaintiffs sue over loan applications from April 2020 and a new corporation that Defendants allegedly formed without Plaintiffs in July 2021.  (ECF No. 1 at PageID 5–6.)  And, as will be shown next, many of the other actions Plaintiffs complain about started even earlier.

Besides suing over the loan applications and the alleged new corporation, Plaintiffs sue over actions Defendants took allegedly to shut Plaintiffs out of eMars. (*Id.* at PageID 7–9.) In particular, Plaintiffs assert that Defendants have stopped paying salaries and distributions to Plaintiffs, excluded Plaintiffs from management decisions, denied Plaintiffs access to information about eMars' finances, entered into contracts with clients without Plaintiffs' review and approval, blocked Plaintiffs' access to eMars' payroll system, removed Plaintiffs from eMars' email system, moved the location of eMars' computer servers, and brought in another individual to buy Plaintiffs' stock. (*Id.* at PageID 7–9.) But Plaintiffs, in either their verified Complaint or in M. DeHority's Declaration, have, for the most part, left out dates for when these actions happened. (*See* ECF Nos 1, 22-1.)

Rather the Court learned when many of these events occurred from Chamberlain's Declaration. (ECF No. 18-1.) And the actions Plaintiffs sue over did not happen recently. For example, Chamberlain explains that Plaintiffs have never received a salary from eMars and have never received equal compensation. (*Id.* at PageID 147.) Concerning Plaintiffs' access to information, Chamberlain explains that Plaintiffs have never had access to the payroll system (eMars got this system in 2023) and he discontinued Plaintiffs email accounts in 2021. (*Id.* at PageID 149, 151.) Chamberlain adds that he never moved the location of eMars computer servers, but Defendants relocated the data to the cloud in February 2021 because the server "lacked adequate security and bandwidth." (*Id.* at PageID 151.) And about Plaintiffs' allegation that Defendants brought in an individual to buy Plaintiffs stock, Chamberlain explains that an individual considered buying out Plaintiffs' stock back in 2023. (*Id.*) All of this shows that the complained of activities happened between 2 and 15 years ago.

Plaintiffs also sue over Defendants entering contracts with clients without Plaintiffs'
review and approval.  (ECF No. 1 at PageID 8.)  But again, the evidence shows that this practice
started years ago.  According to Chamberlain's Declaration, he has procured thousands of
contracts over the years, dating back to 2010.  (ECF No. 18-1 at PageID 146.)  And, according to
him, Plaintiffs never helped obtain the contracts.  (*Id.*)

Plaintiffs counter that they have had a more active role in eMars than Chamberlain
describes.  But, as an example, M. DeHority describes a contract from 2007.[3]  (ECF No. 22-1 at
PageID 204.)  Furthermore, a statement in M. DeHority's Declaration supports Chamberlain's
position that he has entered into contracts without Plaintiffs' approval for a long time.  As M.
DeHority states, "in 2011, Woody attempted to sign a major contract with Southern Company on
eMars's behalf without having Richard, Phil, or me read the contract and approve it."  (*Id.* at
PageID 206.)  And this shows that the alleged dispute about Chamberlain unilaterally signing
contracts dates back to at least 2011.  In the end, both Chamberlain's Declaration and M.
DeHority's Declaration show that Chamberlain started entering contracts for eMars long ago.
Plaintiffs cannot wait almost 15 years and then ask for a TRO or preliminary injunction based on
these actions.

As a final point here, Plaintiffs also sue because Defendants have excluded them from
management decisions.  But as with all the other actions above, Defendants' exclusion of
Plaintiffs from management decisions is not new.  As Chamberlain states, "stockholders have
operated in the same manner for nearly 20 years, with me running the business and always being

---

[3] Plaintiff M. DeHority states that "on November 7 2007, I facilitated and collected payment for
a one-year contract with Sundt for the use of eMars's payroll compliance services with options to
renew for two additional years."  (ECF No. 22-1 at PageID 204.)  Plaintiff M. DeHority further
states that "Sundt renewed the contract in the following years and recommended eMars to the
U.S. Army Corps of Engineers."  (*Id.*)

in charge of signing contracts and handling customer relationships.  The DeHoritys were aware

of this, and although Michael is the Chairman, and could have called a board meeting if he had

concerns, he never did."  (ECF No. 18-1 at PageID 148.)

Although Plaintiffs counter Defendants' position that Plaintiffs have never been involved

in eMars's management, Plaintiffs give no specific dates when they were involved and when

Defendants started excluding them from the business.  (ECF Nos. 1, 22-1.)  At the preliminary

injunction hearing, Plaintiffs' Counsel represented to the Court that tensions have been bad

between Plaintiffs and Defendants, but that the problems have escalated in the past few years.

He explained that Plaintiffs and Defendants have been at complete odds the past 3 to 5 years.

But even so, this means tensions have been high for at least 3 to 5 years and Plaintiffs did not sue

or ask for an injunction at any point during those years.  Indeed, a letter that Plaintiffs' counsel

sent to Defendants on February 6, 2024, shows that Plaintiffs have been concerned about

Defendants' unilateral management and the exact actions complained of in this lawsuit for well

over a year.  (ECF No. 18-5.)

The actions at issue started many years ago and this lawsuit concerns a long-running

business dispute.  Indeed, the most recent action by Defendants that Plaintiffs sued over

happened in 2023.  And the oldest actions began somewhere between 10 and 20 years ago.  In

the end, Plaintiffs' significant delay in bringing this lawsuit shows that Plaintiffs do not face

irreparable harm.

In fact, courts have held that a mere one-and-a-half-year delay shows that a party does

not face irreparable harm.  *Manlove v. Volkswagen Aktiengesellschaft*, No. 1:18-CV-145, 2019

WL 2291894, at *15 (E.D. Tenn. May 17, 2019) ("Finally, the Court has difficulty ignoring [the

plaintiff's] delay in seeking injunctive relief.  [The plaintiff] learned of his demotion on June 29,

2017. But he did not move for a preliminary injunction until December 6, 2018—more than

seventeen months later."); *Doughtie & Co., Inc. v. Rutherford Cnty.*, No. 3-13-0209, 2013 WL

3995277, at *2 (M.D. Tenn. Aug. 5, 2013) (denying a preliminary injunction when the plaintiff

waited a year and a half to file suit after learning of the alleged injury). The delay here is far

longer and seriously cuts against a finding of irreparable harm.

    **B.**    **Speculative Nature of Injuries and Monetary Damages**

Plaintiffs also fail to show irreparable harm because their alleged injuries are either

compensable with monetary damages or are too speculative. *D.T. v. Sumner Cnty. Sch.*, 942

F.3d 324, 327 (6th Cir. 2019) ("To merit a preliminary injunction, an injury must be both certain

and immediate, not speculative or theoretical." (internal quotation marks omitted)); *Overstreet v.

Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("A plaintiff's harm from

the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary

damages."). To begin, Plaintiffs allege breach of contract claims because Defendants do not pay

them salaries. Relatedly, Plaintiffs, at the hearing, asked this Court to order that Defendants

either (1) stop receiving salaries or (2) start paying Plaintiffs' salaries. But if Defendants should

be paying salaries to Plaintiffs, then monetary damages will compensate Plaintiffs for that harm

at the end of the lawsuit. And so Plaintiffs do not face irreparable harm in the absence of

injunctive relief for the claim related to their salaries.

Next, Plaintiffs argue that they face irreparable harm because, without injunctive relief,

eMars will suffer a loss of goodwill and its reputation will be harmed. But this injury, as

Plaintiffs have framed it here, is speculative, rather than certain and immediate. Although

sometimes courts consider the loss of goodwill and reputation as irreparable harm, the moving

party must show that a company's reputation or goodwill will be impaired absent injunctive

relief. *Marathon Equip. Co. v. Quinn*, No. 1:22-CV-205-TAV-SKL, 2022 WL 16542571, at *3 (E.D. Tenn. Oct. 28, 2022) ("[P]laintiff has not provided evidence that defendant's actions have caused plaintiff's customers to cease doing business with plaintiff or that plaintiff has otherwise been harmed in any way."). And Plaintiffs have not done that here.

In claiming that Defendants' actions have harmed eMars's goodwill and reputation, Plaintiffs point to Chamberlain improperly applying for three loans on behalf of eMars. (ECF No. 1-5 at PageID 39.) With this, Plaintiffs argue that "[a]s a result, there are now records of eMars applying for large loans for which it did not qualify, which reflects poorly on eMars's reputation with the federal government and with other lenders." (*Id.* at PageID 39–40.) Plaintiffs add that "Defendants' refusal to allow the DeHoritys any say in these decisions and continued disregard of the DeHoritys' wishes show that they will continue taking actions that will harm eMars's goodwill and reputation." (*Id.*)

But Chamberlain applied for these loans *five years ago*, in April 2020. What is more, Chamberlain has stated in his sworn Declaration that those PPP loan applications were canceled. (ECF No. 18-1 at PageID 152.) Plaintiffs cannot now use potential issues from five years ago, which have been resolved, to argue that Plaintiffs face imminent harm today. *See STAR Teams, Inc. v. Transplant Advocs.*, LLC, No. 2:22-CV-00022, 2022 WL 2161043, at *5 (M.D. Tenn. June 15, 2022) ("As to its second argument, Plaintiff identified only a potential issue that appears to have already been resolved and failed to identify any ongoing issue at risk of causing 'certain and immediate' harm.").

And, lastly, Plaintiffs assertion that Defendants' continued refusal to let Plaintiffs participate in the business of eMars will continue to harm eMars's goodwill and reputation is not specific enough. (ECF No. 1-5 at PageID 39–40.) Indeed, in their argument, Plaintiffs have

pointed to no recent or impending action on Defendants' part that may damage eMars's goodwill and reputation. (*Id.*)  Likewise, Plaintiffs have pointed to no actual or immediate harm.  For example, Plaintiffs have not pointed to any customers, loans, or opportunities that eMars has missed out on because of Defendants' alleged actions.  *STAR Teams, Inc.*, 2022 WL 2161043, at *5 ("Here, Plaintiff has provided no evidence of losing even a single customer because of the images on Defendant's website.").  In the end, Plaintiffs have not pointed to a certain and immediate injury.

### C.    Business Management and Shareholders' Agreement

Plaintiffs next assert that they will be irreparably harmed without injunctive relief because, as they argue, "[l]osing the right to operate one's business as one sees fit can constitute irreparable injury."  (ECF No. 1-5 at PageID 38–39.)  Indeed, courts have held that irreparable harm may ensue when one's right to run their own business is impeded.  *Gitlitz v. Bellock*, 171 P.3d 1274, 1280 (Colo. App. 2007) ("Loss of a contractual right to manage and control a business may constitute irreparable harm."); *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003) (explaining that the right to participate in the management of a company has "intrinsic value.").  That said, losing the ability to build or operate one's business as one sees fit may not make for the strongest showing of irreparable harm.  *See Lunt v. Frost Shades Franchising*, LLC, No. 3:22-CV-00775, 2023 WL 3484202, at *11 (M.D. Tenn. May 16, 2023) ("The only evidence before the court, however, suggests that, if [the plaintiff] is prevented from building his business for too long, the opportunity will pass him by… .[The plaintiff's] showing of irreparable harm is not overwhelming, but it is sufficient to support an award of preliminary relief.").

Even though the loss of the ability to operate one's own company may support a finding of irreparable harm, given the circumstances here, the Court finds no irreparable harm. Plaintiffs' claim that they will be irreparably harmed by their inability to participate in eMars's management is unpersuasive when the evidence shows (1) that they waited years to bring this lawsuit and (2) that they have not taken action under their corporate structure to manage eMars. For example, Chamberlain points out in his Declaration that M. DeHority serves as the Chairman for eMars, which, according to Chamberlain, means M. DeHority calls and presides "at all stockholder and board of director meetings." (ECF No. 18-1 at PageID 147.)

But according to Chamberlain, M. DeHority "rarely called stockholders meetings, and he has not called a board meeting in years." (*Id.*) Chamberlain adds:

> The stockholders have operated in the same manner for nearly 20 years, with me running the business and always being in charge of signing contracts and handling customer relationships. The DeHoritys were aware of this, and although Michael is the Chairman, and could have called a board meeting if he had concerns, he never did. Before the DeHoritys filed their Complaint in this action, I had no reason to think they wanted any role in running eMars' business. In fact, their actions were to the contrary.

(*Id.* at PageID 148.) And Chamberlain makes a convincing point. If Plaintiffs had concerns about their ability to participate in eMars's management,[4] M. DeHority could have called a board meeting to discuss the problems. But neither side has presented any evidence that M. DeHority ever did that.[5] In addition, as described above, Plaintiffs have waited a very long time to file this

---

[4] The Court notes that Plaintiffs contest Defendants' position that Plaintiffs have never been involved in eMars.

[5] In response to the Court's question about the last time someone called (or tried to call) a board meeting, Plaintiffs' Counsel noted that it was in August 2023. Of course, this is a representation by counsel, not evidence. The Court further notes that it is unclear who called this meeting, whether they even held the meeting or what was discussed at it. And, in any event, if they held the meeting, it was over a year and a half ago.

lawsuit.  All this shows that Plaintiffs, despite their 50% ownership interest in eMars, have not tried to participate in the management of eMars.

Lastly, Plaintiffs point to a provision in the Stockholders' Agreement to support their position that they face irreparable harm.  The relevant provision states: "It is hereby acknowledged that irreparable harm would occur in the event that any of the provisions of this Agreement were not performed fully by the parties."  (ECF No. 10-3 at PageID 81.)  And while it is true that this type of provision is evidence of irreparable harm, it cannot justify a finding of irreparable harm by itself or "act as a substitute for a [finding] regarding injunctive relief." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) ("While courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief."); *see also Am.'s Home Place, Inc. v. Myers, No.*, 1:21-CV-00224-DCLC, 2021 WL 4342588, at *3 (E.D. Tenn. Sept. 23, 2021); *Marathon Equip. Co. v. Quinn*, No. 1:22-CV-205-TAV-SKL, 2022 WL 16542571, at *2 (E.D. Tenn. Oct. 28, 2022) (noting that an agreement which stated that remedies at law would be inadequate for a breach was "some evidence" of irreparable harm, but ultimately finding no irreparable harm).

Accordingly, although the Stockholders' Agreement provides some evidence of irreparable harm here, this evidence does not carry the day.  Rather, for the reasons discussed in the sections above, Plaintiffs have not persuaded the Court that they face irreparable harm absent a preliminary injunction.  What is more, when looking at the Complaint, Plaintiffs' breach of contract claims stem mainly from alleged breaches of the Bylaws, not the Stockholders' Agreement containing the irreparable harm provision.  (*See* ECF No. 1 at PageID 9.)  In the end,

Plaintiffs—given their delays, the speculative nature of their alleged injuries, and their inaction—have not shown that they face irreparable harm without immediate injunctive relief.

## II.    Other Factors

Given the Court has found that Plaintiffs have not shown irreparable harm, the Court need not consider the other factors. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, No. 24-3211, 2025 WL 1099086, at *13 (6th Cir. Apr. 14, 2025) ("No irreparable harm?  No preliminary injunction.").  Even so, the Court provides a broad overview of the remaining factors below.  But the Court saves a more robust analysis for another day.  *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 328 (6th Cir. 2019) (stating that, since the plaintiffs did not show irreparable harm, "the district court rightly left the merits of their claims for another day.").

### A.    Likelihood of Success on the Merits

At this stage, Plaintiffs have not shown a likelihood of success on the merits.[6]  To prevail on this factor, the moving party "is not required to prove his case in full at a preliminary injunction hearing," but the party "must show more than a mere possibility of success."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).  In other words, the Court must determine that "the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (citation omitted).  Still "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof

---

[6] To the extent that Plaintiffs have brought claims for the lack of access to eMars's records, Defendants have now provided Plaintiffs with some records as described in the Motion for Expedited Discovery section below.

required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

Plaintiffs' claims here boil down to several key events.  And, on the whole, the differences between Plaintiffs' version and Defendants' version of the events are stark.  As is shown in the background section of this Order, Defendants' explanations are currently more comprehensive and provide important information, like when and why certain actions happened.  Considering Defendants' proof and explanations about the key events, the Court, while looking at this factor from a high-level view, finds that Plaintiffs have not shown "more than a mere possibility of success" on their claims, meaning they have not shown likelihood of success on the merits.  That said, some of Defendants' actions, on their face, do concern the Court.  And so, as discovery for this case unfolds and the Court receives testimony and more evidence, perhaps the Court's position on this factor will change.

As a final point, although the Court need not delve into the specifics now given the lack of irreparable harm, the Court observes that Defendants have raised affirmative defenses.  While the Court declines at this time to opine on all the affirmative defenses raised, the Court notes that some of Plaintiffs' claims may be barred, or at least limited in scope, by certain statutes of limitations.

### B.    Substantial Harm to Others

The third factor courts consider is whether granting a preliminary injunction would cause substantial harm to others.  Indeed, courts deciding whether to grant a preliminary injunction "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing reference omitted).  And "[w]hen addressing whether a preliminary

19

injunction would cause substantial harm to others, the Court may consider potential harm to non-parties and to Defendants." *S.B. by & through M.B. v. Lee*, 566 F. Supp. 3d 835, 869 (E.D. Tenn. 2021).

The Court finds that this factor is neutral. While Defendants argue that there will be substantial harm to others if the Court grants the preliminary injunction, their claim here is largely speculative in the same way that Plaintiffs' assertion that they would face irreparable harm without an injunction is speculative. For example, Defendants write, "[i]nterrupting eMars' business and giving Plaintiffs control over or access to the business and clients would at a minimum cause confusion and concern with eMars' clients about the ability of eMars to effectively deliver a compliant solution." (ECF No. 18.) But this is a broad assertion without much detail. And both sides have pointed to specific acts that the other side took that either harmed or could have harmed them, eMars and its customers. But most of these acts happened several years ago. (*See* ECF Nos. 1, 18, 18-1, 22.) And so, the Court finds that this factor is neutral.

### C.    Public Interest

The final factor courts consider is the public interest. In general, "[t]he public interest is served by enforcing contractual agreements." *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, No. 24-3211, 2025 WL 1099086, at *14 (6th Cir. Apr. 14, 2025). That said, the parties dispute which contracts are enforceable, the meaning of the contracts, and whether Defendants have breached the relevant contracts. And so, given the Court's view of the likelihood of success factor and the disputes around the contracts, the Court finds that the public interest factor is either neutral or favors Defendants right now. *Id.* ("[W]hat's disputed here is who has what

rights under the relevant documents.  So it's not obvious to us which side the public interest

favors, at least not without turning back to the merits.").

## III.    Conclusion on the Preliminary Injunction Motion

Given the lack of irreparable harm, the Court **DENIES WITHOUT PREJUDICE**

Plaintiffs' Preliminary Injunction Motion.  And at this time, the remaining three preliminary

injunction factors are either neutral or weigh in Defendants' favor.  That said, the Court is

mindful that Plaintiffs have not had much information about eMars in recent years.  And so, as

discovery in this case continues, the Court will allow Plaintiffs to move for a preliminary

injunction again if they learn that Defendants have taken recent actions or plan to take actions

that will cause Plaintiffs irreparable harm.

**MOTION FOR EXPEDITED DISCOVERY**

When Plaintiffs started this lawsuit, they moved for limited, expedited discovery.  (ECF

No. 1-6.)  Plaintiffs sought: (1) the statements for all of eMars's bank accounts, or where any of

eMars's funds have been held, as well as copies of all checks written on those accounts from

2020 forward; (2) all loan applications submitted on behalf of or for eMars; (3) copies of all

1099s and W-2s for eMars from 2020 forward; (4) all documents showing any outstanding

accounts receivable and liabilities of eMars; (5) all contracts and agreements to which eMars is a

party entered into by Defendants on eMars's behalf; and (6) all documents pertaining to the

formation and incorporation of eMars, Inc. in the State of Washington.  (ECF No. 1-8 at PageID

53.)

At a status conference on April 4, 2025, Defendants agreed to provide certain records,

including bank statements, copies of 1099s and W-2s, financial statements, and contracts and

agreements of eMars, to Plaintiffs under a protective order.  On April 7, 2025, the Court entered

21

a protective order in this case that was agreed upon by the Parties. (ECF No. 11.) And Chamberlain confirms in his Declaration that Defendants provided the agreed upon documents. (ECF No. 18-1 at PageID 151.)

At the preliminary injunction hearing, Plaintiffs' counsel stated that Plaintiffs have not received 2025 checking account statements for eMars and that they noticed, after reviewing eMars's balance sheets, that there are other eMars bank accounts that they did not receive documentation on. The Court thus **ORDERS** Defendants, if they have not done so already, to provide Plaintiffs with eMars's 2025 checking account statement and bank statements covering the past five years for any other eMars bank account. And considering that the Court will allow Plaintiffs to move for a preliminary injunction again if they discover new evidence of wrongdoing, the Court finds it appropriate for Defendants to provide Plaintiffs with additional expedited discovery. The Court therefore **ORDERS** Defendants to provide Plaintiffs with all nonprivileged documents and communications concerning the formation and incorporation of eMars, Inc. in Washington state. The Court also **ORDERS** Defendants to provide Plaintiffs with all loan applications submitted on behalf of eMars within the past five years. Defendants have fourteen days from the entry of this Order to provide Plaintiffs with these items.

As a final point, Defense Counsel stated that they agreed to provide monthly financial statements to Plaintiffs during this litigation. The Court expects that Defendants will continue to provide these monthly financial statements as the case proceeds.

## CONCLUSION

For the reasons above, the Court **DENIES WITHOUT PREJUDICE** Plaintiffs' Preliminary Injunction Motion and **ORDERS** Defendants to produce expedited discovery as described above.

22

**SO ORDERED**, this 29th day of April, 2025.

s/Thomas L. Parker
_____
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE